IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NICKOLAS IPPOLITO and RACHEL IPPOLITO,**<br>            **Plaintiffs,**<br><br>                    v.<br><br>**OFFICER DENNIS AHERNE; OFFICER RYAN MURPHY; OFFICER STEVEN SCOTT; OFFICER JOHN MCBRIDE; DETECTIVE DONALD D'GINTO; and UWCHLAN TOWNSHIP,**<br>            **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  14-6077** |

## MEMORANDUM OPINION

This case arises out of the arrest of Plaintiff Nickolas Ippolito on charges of Hindering Apprehension or Prosecution and Disorderly Conduct.  Plaintiff sues police officers Dennis Aherne, Ryan Murphy, and Steven Scott, and Detectives John McBride and Donald D'Ginto (collectively, the "Individual Defendants") alleging claims for excessive force and malicious prosecution under 42 U.S.C. § 1983, conspiracy under 42 U.S.C. § 1985, and state-law claims for assault and battery, false arrest, and false imprisonment.  Plaintiffs also sue the Individual Defendants' employer, Uwchlan Township, asserting a claim under *Monell v. City of N.Y. Dept. of Social Servs.*, 436 U.S. 658 (1978).  Rachel Ippolito, Nickolas Ippolito's spouse, sues the Defendants for loss of consortium.

Nickolas Ippolito (hereinafter, "Ippolito") moves for partial summary judgment on his claims for malicious prosecution, false arrest and false imprisonment.  The defendants move for summary judgment as to each of Ippolito's claims.  For the reasons discussed below, Ippolito's motion is denied in its entirety; Defendants' summary judgment is granted as to Counts I (excessive force), II (malicious prosecution), III (conspiracy), and VII (*Monell*); and Ippolito's

remaining claims under Counts IV (assault and battery), V (false arrest), VI (false imprisonment), and VIII (loss of consortium), shall be dismissed as a matter of discretion pursuant to 28 U.S.C. § 1367(c), without prejudice to those claims being asserted in state court.

## I. Background

On October 24, 2012, Helen Gaffney contacted the Uwchlan Township Police Department regarding her daughter, Jacqueline Chambers. JA at 21. Mrs. Gaffney stated that Chambers failed to report to a bail hearing in Caln Township and that a warrant was issued for Chambers' arrest. Chambers had jumped out of a van owned by the drug rehabilitation center where she was being treated and was thought to be staying at the Extended Stay America Hotel ("the Hotel") in Exton, Pennsylvania. An Uwchlan Township police officer responded to the Hotel but was unable to locate Chambers. *Id.*

On October 25, 2012, Chambers' father, Bill Gaffney, called Uwchlan Township police and reported that he had just left Chambers in room 128 of the Hotel, and that she had declined to turn herself in in response to the outstanding warrant. JA 366-67; Plaintiffs' Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment ¶¶ 5-6 ("Pl. Facts"); Response to Plaintiff's Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ¶¶ 5-6 ("Def. Resp."). Mr. Gaffney requested that the police go to the Hotel to serve the warrant. *Id.*

That same day, Ippolito began his shift as the guest services representative at the Hotel at 7:00 a.m. When he arrived, the Hotel's log reflected that a guest in room 128 had requested a room change. JA 405. Around 7:10 a.m., Chambers came to the front desk and Ippolito moved her to room 215. JA 407. Shortly thereafter, Officer Aherne arrived at the hotel desk and asked Ippolito if he knew who was in room 128. JA 367. Ippolito declined to identify the guest in that

room.  JA 367.  Aherne and another officer then proceeded to knock on the door to room 128. JA 367.  While the officers were knocking on the door to room 128, Ippolito called his manager on the telephone to inquire what information he could provide to the police.  Ippolito testified that his manager responded that Ippolito could not provide information to the police regarding Chamber's whereabouts absent a warrant.  JA 155, 415, 494.  As Aherne continued to knock on the door, Ippolito informed him that the room was empty.  JA 367, 416.

Aherne believed that he heard noises and voices coming from inside the room.  As a result, he returned to the front desk and questioned Ippolito regarding whether anyone was in the room.  JA 367.  Ippolito declined to answer and retreated to an inner office to call his manager. JA 367, 416.  The manager informed him that, in light of the fact the room was empty, he could provide the police with a key, and he did so.  JA 416-17.

When Aherne returned to the hotel desk, he heard the lobby stairway door open and observed a girl with dark brown hair retreating into the stairwell.  JA 367.  Aherne followed the girl and heard her enter room 215, then returned to the hotel desk and asked Ippolito to identify the guest in room 215.  *Id*.  Ippolito declined to provide the information.  Pl. Facts ¶ 19; Def. Resp. ¶ 19.  Aherne testified that he telephoned Mr. Gaffney and confirmed that Chambers had brown hair rather than the blond hair shown in her photograph.  JA 367-68.

Another officer, D'Ginto, telephoned Stacy Izzo, the Hotel's district manager, whom he knew from a prior case, and asked for her assistance in obtaining the information the officers sought.  JA 116-17, 343.  D'Ginto testified that Izzo informed him that the officers could go behind the hotel desk and take whatever they needed and that she would call the hotel and

instruct Ippolito to provide the information, to be cooperative, and to give the officers a key to Chambers' room.[1]  Pl. Facts ¶¶ 28-29; Def. Resp. ¶¶ 28-29.

D'Ginto again went to Ippolito, asked him whether he had spoken to Izzo, and requested information about Chambers whereabouts.  Ippolito still refused to provide the information.  Officer Scott, who also was present, informed Ippolito that, if he did not comply with D'Ginto's requests, he would be arrested for obstruction.  Pl. Facts ¶¶ 30-32; Def. Resp. ¶¶ 30-32; JA 344.  Ippolito was then told he was under arrest.  Pl. Facts ¶ 34; Def. Resp. ¶ 33.

At this point, Ippolito was located behind a locked door, and the only means of access to him would have been by jumping over the hotel counter.  Pl. Facts ¶¶ 13, 35-36; Def. Resp. ¶¶ 13, 35-36.  Scott drew his Taser and threatened that if Ippolito did not open the door to the office, Scott would tase him for failing to cooperate.  Pl. Facts ¶ 35; Def. Resp. ¶ 35.  Ippolito opened the office door and the officers placed him under arrest.[2]  Pl. Facts ¶ 36; Def. Resp. ¶ 36.  Ippolito was charged by the Individual Defendants with Hindering Apprehension or Prosecution, 18 Pa. Cons. Stat. § 5105, and Disorderly Conduct, 18 Pa. Cons. Stat. 5503.  JA 111-14.  At a preliminary hearing, the Chester County District Attorney's Office withdrew the Hindering Apprehension charge and replaced it with a charge of Obstruction of the Administration of Justice, 18 Pa Cons. Stat. § 5101.  *Id*.  The judge found that probable cause existed and bound the case over for trial.  Defendants' Statement of Undisputed Material Facts ("Def. Facts") ¶ 46; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("Pl. Resp.") ¶ 46.

---

[1] Izzo disputed this in her testimony before the Magisterial District Court, stating that she did not authorize Ippolito to give the officers a key or to permit them behind the counter.  JA 117-19.

[2] A maintenance worker at the Hotel subsequently opened room 215 for the officers, where they found Chambers and placed her under arrest.  Pl. Facts ¶ 22-23; Def. Facts ¶¶ 38-39.

The criminal case was eventually resolved when the court dismissed the obstruction charge and the District Attorney's Office "nolle prossed" the disorderly conduct charge.[3] JA 102-09.

## II. LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for

---

[3] A *nolle prosequi* action (colloquially referred to by the parties as a past tense verb, *i.e.* "*nolle pross*'ed") is a voluntary withdrawal by the prosecuting attorney of present proceedings on a particular bill of indictment. Pa. R. Crim. P. 585; *see also Commonwealth v. Whitaker*, 467 Pa. 436 (1976).

the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (citing *Anderson*, 477 U.S. at 252).

## II.   ANALYSIS

### A.   *Section 1983 Malicious Prosecution*

Ippolito contends that he is entitled to summary judgment on his Section 1983 claim because the Individual Defendants lacked probable cause for his arrest, imprisonment, and prosecution.  Pl. Mot. at 3-9.  In response, the Individual Defendants contend that probable cause existed (Def. Mot. at 8-11)[4] and that even if it did not, they are entitled to qualified immunity for their conduct.  *Id*. at 13-15.

The Individual Defendants argue that, in accordance with Supreme Court precedent, qualified immunity shields government officials from civil damages liability unless the official: (1) violated a statutory or constitutional right; and, (2) the right was clearly established at the time of the challenged conduct.  *See e.g.*, *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *Taylor v. Barkes*, 135 S.Ct. 2042 (2015).  To be clearly established, the "right must be sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right."  *Reichle*, 132 S.Ct. at 2093.  When the material facts surrounding the arrest are not in dispute, as is the case here, the question of whether a government official has established the defense of qualified immunity is a matter of law.  *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

In analyzing the applicable law pursuant to the second prong of the test, s*ee Egolf v. Witmer*, 526 F.3d 104, 110 (3d Cir. 2008); *Ashcroft v. al-Kidd,* 563 U.S. 731, 731 (2011) (courts have discretion as to the order in which to address the two-part test), there need not be a case

---

[4]   Claims for malicious prosecution require as an element that the prosecution be undertaken without probable cause. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 984 (Pa. Super. Ct. 1997).

"directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 731. The test for whether probable cause exists for an arrest is an objective one. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). "Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law. As long as the officers had some reasonable basis to believe [Ippolito] had committed a crime, the arrest is justified as being based on probable cause." *Id*. In the present case, the precedent regarding whether there was probable cause to believe that Ippolito committed the offense of Hindering Apprehension or Prosecution, a felony, is open to debate.[5] 18 Pa. Cons. Stat. § 5105(a), (b). The statute provides that:

> A person Commits an offense if, with intent to hinder the apprehension, prosecution, conviction, or punishment of another for a crime or violation of the terms of probation [or] parole . . . , he:
>
> (1) Harbors or conceals the other;
>
> (2) Provides or aids in providing a weapon, transportation, disguise, or other means of avoiding apprehension or effecting escape;
>
> (3) Warns the other of impending discovery or apprehension . . . ;
>
> (4) Provides false information to a law enforcement officer.

Case law interpreting this provision is clear that a person confronted by an officer in a "mere encounter" on the street has no obligation to speak with the officer or to answer his questions. *Pennsylvania v. Matos*, 672 A.2d 769, 775 (Pa. 1996); *Pennsylvania v. Barnes*, 14 A.3d 128, 132 (Pa. Super Ct. 2011). However, the obligations of a person who has knowledge regarding the location of a fugitive, and control over access to that location, are far less defined.

---

[5] The individual defendants also charged Ippolito with disorderly conduct, 18 Pa. Cons. Stat. § 5503, based on the questionable theory that he had caused a disturbance of the peace by refusing to tell them Chambers' location so that they were forced to cause a disturbance by knocking loudly on the Hotel room door. Because the Court finds the Individual Defendants are entitled to qualified immunity with respect to the hindering charge, it need not consider the propriety of the disorderly conduct charge, since the hindering charge provided a basis for Ippolito's arrest, imprisonment, and prosecution. *See Barna*, 42 F.3d at 819 ("[p]robable cause need only exist as to any of offense that could be charged under the circumstances).

In *Pennsylvania v. Neckerauer*, 617 A.2d 1281, 1285 (Pa. Super. Ct. 1992), the court held that lying in response to police officers' questions did not constitute the kind of affirmative conduct required by the hindering apprehension or prosecution statute. In contrast, a defendant who locked the door to her apartment, where the person sought by police was hiding in a shower stall, was guilty of hindering. *Pennsylvania v. Migdalia*, 657 A.2d 1298, 1301 (Pa. Super. Ct. 1995). Here, neither party has been able to identify a case that sufficiently addresses the circumstances found in this case. There is no guiding precedent regarding the rights of a hotel employee who, having just facilitated a fugitive's moving out of the hotel room which the police intended to investigate (*cf. Migdalia*), and knowing the location of a fugitive, refuses to reveal the fugitive's new location to police (*cf. Neckerauer*).

Under the scant precedential guidance available to them, it cannot be said that "every reasonable official would have understood" that Ippolito was *not* unlawfully harboring or concealing Chambers, or providing her with a means of avoiding apprehension, in violation of the Section 5105. *al-Kidd*, 131 S.Ct. at 2083 (internal citations omitted). Thus, it cannot be said that "existing precedent [had] placed . . . beyond debate" that Ippolito had a right not to be prosecuted for his conduct. *al-Kidd*, 131 S.Ct. at 2083. The Individual Defendants could not be reasonably expected to know the law forbade the subject conduct, and the qualified immunity defense must be sustained. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).[6] Accordingly, the Individual Defendants are entitled to qualified immunity, and summary judgment will be granted against Ippolito on his malicious prosecution claim.

**B.**     *Section 1983 Excessive Force*

---

[6] While not dispositive, the fact the judge at the preliminary hearing found probable cause to bind Ippolito over for trial also provides "weighty evidence" that the officers reasonably could have believed they had probable cause for the charges against Ippolito. *Snell v. Duffy*, No. 02-3660, 2004 WL 62711, at 85 (E.D. Pa. Jan. 6, 2004).

Ippolito asserts that the Individual Defendants used excessive force in making his arrest when Officer Scott brandished a Taser at him. Pl. Opp'n at 16. A claim that an officer used excessive force to effect an arrest arises under the Fourth Amendment's guaranty of individuals' "right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend IV). The determination of whether a police officer charged under Section 1983 with use of excessive force is entitled to qualified immunity is also a two-part inquiry.

First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show that the officers' conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001). If so, the court must examine the law in question (here, the Fourth Amendment's prohibition on unreasonable search and seizure) to determine whether the law put the officer on notice that his conduct was unlawful. *Id.* at 202. Only if a reasonable officer would recognize that the degree of force he used in a given situation was "clearly unlawful" will he be deprived of qualified immunity. *Id.* at 202-07. In other words, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 202 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

Measuring the reasonableness of a use of force "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The analysis is a fact-specific one and includes consideration of such factors as: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Third Circuit has identified the following additional factors for consideration: "the possibility that the persons

subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Ippolito bases his excessive force claim entirely on the evidence that Officer Scott pointed a Taser at him and threatened to tase him if he did not open the locked office door so that the officers could place him under arrest.[7] Although there is no evidence or claim that Scott used actual force against Ippolito in making his arrest, Ippolito argues that "an officer's specific threat to cause harm may, under the totality of the circumstances, contribute to an excessive force claim." Pl. Mot. at 16 (quoting *Black v. Stevens*, 662 F.2d 181, 188-89 (3d Cir. 1981)). The case upon which Ippolito relies involved a policeman who held a gun eighteen inches from the plaintiff's head and threatened to shoot him. *Black*, 662 F.2d at 189. The immediate threat of deadly force in *Black* was of a far different magnitude than the threat to Ippolito of non-deadly force in the form of a Taser.

Here, the crime for which Ippolito was being arrested was a felony. 18 Pa. Cons. Stat. § 5105(b); JA at 93. Ippolito was secured behind a hotel counter and a locked door. Def. Facts. ¶ 34; Pl. Resp. ¶ 34. Although there was no specific reason to believe Ippolito was armed, Officer Scott testified that, based on his experience with other hotels located in Uwchlan Township, weapons are often kept behind the counter for the safety and protection of the hotel staff. JA 260. Up to that point, Ippolito had been uncooperative in responding to police requests. Although he was not actively resisting arrest, he was failing to comply with the officer's order

---

[7] Defendants apparently assumed that Ippolito would base his claim on the allegation in the complaint that they used his face to push open the door. Plaintiff did not raise that argument, but relied solely on the threat of the Taser as excessive force. Defendants' reply brief did not respond to the Taser argument.

and continuing to obstruct the officer's efforts to obtain information regarding Chamber's whereabouts from the hotel records.

Ippolito has not identified any authority for the proposition that the threat of non-deadly force in obtaining compliance from a subject, subsequent to an officer's direction that the subject is under arrest, is excessive. Thus, it cannot be said that using the threat of non-deadly force in the form of a Taser was "clearly unlawful." Defendants are therefore entitled to qualified immunity for their conduct, and summary judgment is granted against Ippolito's excessive force claim.

### C. *Section 1985 Conspiracy*

Plaintiffs allege that the Individual Defendants conspired to commit acts that constituted excessive force and malicious prosecution. Complaint at ¶ 66. An official who is immune from suit for a Section 1983 violation is also immune from liability under Section 1985 for a claim of conspiracy to commit the conduct that is the subject of the Section 1983 violation. *See Downey v. Coalition Against Rape & Abuse*, 143 F.Supp.2d 423, 452-53 (D. N.J. 2001) (citing *Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994)); *Snatchco v. Peters Twp.*, No. 12-1179, 2012 WL 6761369, at *12 (W.D. Pa. Dec. 28, 2012) (where complaint failed to state a claim for a civil rights violation, township employees were entitled to qualified immunity); *Perano v. Arbaugh*, No. 10-01623, 2011 WL 1103885, at *18 (E.D. Pa. March 25, 2011) (applying qualified immunity to conspiracy claim). Accordingly, the Individual Defendants are entitled to summary judgment against Ippolito's conspiracy claim.[8]

### D. *Monell*

---

[8] Although the parties both argue their case on the merits, because the Individual Defendants are entitled to qualified immunity, the Court need not extend its analysis further.

Ippolito asserts a claim against Uwchlan Township for its alleged failure to train its police officers. That claims suffers from a number of deficiencies. First, stating a claim under *Monell* requires that a municipal policy or custom has caused a constitutional violation. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 691 (1978); *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995). As discussed in Sections III(A)-(C), *supra*, Ippolito has failed adequately to allege any constitutional violation on which to base a *Monell* claim. Second, Ippolito fails to present any evidence that any individual municipal policymaker or decision maker had knowledge of the alleged policy or custom of arresting and prosecuting people without probable cause or of using excessive force. *See McTernan v. City of York*, 564 F.3d 636, 658-59 (3d Cir. 2009); *Santiago v. Warminster Township*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (noting a plaintiff's "obligation to plead in some fashion that [a natural person] had final policymaking authority, as that is a key element of a *Monell* claim").

Ippolito has also failed to present any evidence that the misconduct he alleges was part of a pattern of constitutional violations caused by Uwchlan Township's failure to train its officers. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) (citation omitted). In support of his claim, Ippolito points to testimony from Izzo in which she recalled an incident where Uwchlan Township police came to another hotel with a warrant for the arrest of a hotel guest, and refused to explain their actions to the hotel manager. Opp. at 20-21. However, Ippolito fails to explain how the officers' conduct on that occasion violated a constitutional right, or how any such violations are of a pattern to the constitutional violations alleged here. Accordingly, Uwchlan Township is entitled to summary judgment as to Ippolito's *Monell* claim.

12

E.  State Tort Claims

Plaintiffs' only remaining claims are based on state torts: assault and battery; false arrest; false imprisonment; and loss of consortium. The Pennsylvania Tort Claims Act permits a government employee to raise the defense of official immunity in a number of circumstances, including where "the conduct of the employee . . . was authorized or required by law, or [where] he in good faith reasonably believed the conduct was authorized or required by law." 42 Pa.C.S.A. § 8546(2). Section 8550 of the Code abrogates the immunity defenses when it is "judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S.A. § 8550; *see also Renk v. City of Pittsburgh*, 537 Pa. 68, 75 (1994). As discussed throughout this opinion, Pennsylvania precedent insufficiently defines the obligations of a person with knowledge regarding the location of a fugitive and control over access to that location to cooperate with police, or how police must respond in those circumstances. Given the uncertainty, it is rash to speculate on what a Pennsylvania court would or should decide regarding the state tort claims here, where the only remaining claims are state law claims and the district court has discretion to decline to exercise pendent jurisdiction if it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) ("wide discretion to remand rather than to dismiss . . . best serves the principles of judicial economy, procedural convenience, fairness to litigants, and comity to the States"); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) (pendent jurisdiction "is a doctrine of discretion, not of plaintiff's right").

Where, as here, all federal claims have been "dismissed on summary judgment, 'the court should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of

extraordinary circumstances.'" *Angeloni v. Diocese of Scranton*, 135 F.App'x 510, 514-15 (3d Cir. 2005) (alteration in original) (citing *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 1187, 1196 (3d Cir. 1976)). Neither party has identified any extraordinary circumstances that would warrant the state claims being heard in federal court. Consequently, the decision to remand the remaining tort claims "reflects the court's judgment . . . that at the present stage of litigation it would be best for supplemental jurisdiction to be declined so that state issues may be adjudicated by a state court." *Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 253 (3d Cir. 2008).

Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' state torts and shall dismiss Counts IV (assault and battery), V (false arrest), VI (false imprisonment), and VIII (loss of consortium), without prejudice to those claims being asserted in state court.[9]

                                                **BY THE COURT:**

                                                **/S/WENDY BEETLESTONE, J.**

                                                **WENDY BEETLESTONE, J.**

---

[9] "When a District Court declines to exercise supplemental jurisdiction over state law claims, the statute of limitations is tolled while the federal suit is pending and for a period of 30 days after the suit is dismissed." *Petrossian v. Cole*, 613 Fed. App'x 109 (3d Cir. 2015) (citing 28 U.S.C. § 1367(d)) ("The period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period").